IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 23, 2010 Session

## MISTY JANE BRUNELLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Greene County**
**No. 08CR350     John F. Dugger, Jr., Judge**

**No. E2010-00662-CCA-R3-PC - Filed June 16, 2011**

The petitioner, Misty Jane Brunelle, appeals the post-conviction court's denial of her petition for post-conviction relief from her convictions for three counts of aggravated child abuse and resulting effective sentence of twenty-five years to be served at one hundred percent.  On appeal, she contends that (1) she received the ineffective assistance of counsel at trial and on appeal; (2) the post-conviction court erred by denying her motion for further genetic testing on the victim; and (3) the post-conviction court erred by determining that newly discovered evidence does not exist in this case.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's ruling that the petitioner did not receive the ineffective assistance of counsel and the post-conviction court's denial of the motion for additional genetic testing.  However, the court's determination that newly discovered evidence does not exist in this case is reversed because that issue should have been raised in a petition for writ of error coram nobis.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and D. KELLY THOMAS, JR., JJ., joined.

Brent M. Hensley, Greeneville, Tennessee, for the appellant, Misty Jane Brunelle.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Cecil Clayton Mills, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

In 2005, the Greene County Grand Jury indicted the petitioner for four counts of aggravated child abuse, a Class A felony. We glean the following facts from this court's opinion in the petitioner's direct appeal: The petitioner; her then-husband, Jason Brunelle; and their infant daughter, the victim, moved to Tennessee on January 13, 2003. State v. Misty Brunelle, No. E2006-00467-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 565, at *5 (Knoxville, July 13, 2007), perm. to appeal denied, (Tenn. 2007). On January 28, 2003, the petitioner and her husband took the victim to the Takoma Adventist Hospital because the victim had been crying all day and had a swollen leg. Id. **2, 7. When a registered nurse assessed the victim's condition, she saw that the baby's arm was limp and that her leg was swollen two to three times its normal size. Id. at **2-3. An x-ray revealed fractures in the victim's left humerus, the long bone in the arm; left radius, the bone under the thumb; and the left femur, the thigh bone. Id. at *3. Neither parent gave an explanation for how the injuries could have occurred. Id. *4.

Jason Brunelle testified that the victim was born healthy on October 22, 2002, and that she did not show any signs of injury before January 13, 2003. Id. at **5-6. He and the petitioner took the victim to the hospital because the victim had been crying unusually for about one week and was less active than normal. Id. at *6. He said that he never hurt the victim, that he never saw anyone hurt the victim, and that he never rolled onto the victim. Id. Although he told people at the hospital that brittle bone disease was in his family, he later found out that was not true. Id. at *7. He said he had never had a broken bone. Id. at *6.

An employee from the Department of Children's Services (DCS) testified that she spoke with the petitioner at the hospital. Id. at *7. At first, the petitioner claimed she did not know how the fractures occurred. Id. The next day, the petitioner telephoned the DCS employee and told her that the victim's bones had been broken when Jason Brunelle fell asleep and rolled onto the victim. Id. at *8. The petitioner gave a written statement to an investigator in which she said she had never done anything to hurt the victim and had never seen anyone harm the baby. Id. at *10. The petitioner also stated, "But most of the time, when I get impatient with [the victim] crying, I will holler at Jason. When Jason's not at home, I just handle it." Id. In another written statement, the petitioner said the following:

> Jason, [the victim], and I have been in Tennessee since the middle of January 2003. While staying at my mom, Tammy Pitt's home, I sometimes while playing with [the victim] I will get both her legs and push them back and forth like she was riding a bicycle. I do it hard. [The victim] would smile. Also, since being back in Tennessee, I was home alone with [the

victim] and I dropped [her] and caught her by her left arm.  I sometimes will get around her chest with my hands and put her over my head, and I will stick my tongue out at her.  When [the victim] is crying, I get upset because she won't stop.  I will not pick her up but sometimes when nobody is there, I will take care of her.

I sometimes give [the victim] to Jason or someone else [when] I get upset.  The night I hit the dresser with my hand was the night [the victim] was taken.  Sometimes I black - block things out of my head when I've done things or if I'm upset.  If [the victim] was here right now, I would tell her that I'm sorry for the pain that I've caused her, that I would take care - take the pain for her.  I love her very much.  When doing her - [the victim]'s legs, it's not really hard, it's not like gentle as glass.  One time Jason threw [the victim] up in the air, and I told him not to do it anymore.

Id. at **11-12.

Dr. Robert Thomas, a radiologist who specialized in analyzing children's x-rays, testified that he analyzed the victim's x-rays and found fractures in the victim's upper arm, in the forearm, in both femurs around the knee joints, and in the left tibia near the victim's ankle bone. Id. at *13.  He estimated that the fracture to the left femur occurred two to three weeks before the petitioner took the victim to the hospital, that the fracture to the right femur and the left tibia occurred one to two weeks before the victim was taken to the hospital, and that the fractures to the left arm occurred seven to ten days before the victim was taken to the hospital. Id. at **13-14.  He said that the breaks in the victim's femurs would have required force more significant than that used in a baby's normal care or play and that the break in the left femur occurred from "wrenching." Id. at *14.  He said the break in the victim's left tibia was caused by force well above that used in a baby's normal care or play and also showed signs of "'wrenching.'" Id.  He said the break in the victim's upper arm also was caused by "'wrenching,'" while the break in the forearm was caused by a "'direct blow.'" Id.  He saw no signs that the victim suffered from osteogenesis imperfecta (OI), also known as brittle bone disease. Id.

The petitioner's mother testified for the petitioner that the petitioner, Jason Brunelle, and the victim lived with her in Greeneville; that Jason kept the baby sometimes without the petitioner being present; and that she did not see anyone harm the baby. Id. at **15-16. Jane Grooms, the petitioner's grandmother, testified that she visited the petitioner's home every

day and never saw anyone hurt the victim. Id. at *16. The petitioner testified that parts of her statements to the investigator had been lies, that Jason Brunelle had been violent toward her, and that she had seen him throw the victim over his head. Id. at *17. Regarding the portion of her statement in which she said she blocked things out of her head and caused pain to the victim, the petitioner said she meant "'that if I could do it all over again, she wouldn't have had the sorry excuse of a father she had. She would have had a better life and she wouldn't have had to go through all she's gone through.'" Id. at *18. The jury found the petitioner not guilty of count one involving the left femur fracture, which apparently occurred before the family moved to Tennessee. Id. at *20. However, the jury convicted the petitioner of count two involving the fracture to the victim's right femur; count three, involving the fracture in the victim's left tibia; and count four, involving the fractures in the victim's left arm bones. Id. After a sentencing hearing, the trial court sentenced the petitioner to twenty-five years for each conviction to be served concurrently. Id. at *21.

Following our supreme court's denial of the petitioner's application for permission to appeal, she filed a timely petition for post-conviction relief. Relevant to this appeal, the petitioner claimed that she received the ineffective assistance of counsel because she did not receive the victim's genetic test results for OI until after the trial. She also argued that she was unable to defend herself properly without the victim's medical records and that newly discovered evidence existed in the case. The post-conviction court appointed counsel. Counsel did not file an amended petition but filed a motion for additional genetic testing on the victim to determine whether the victim suffered from OI.

At the evidentiary hearing, counsel testified that he had been the Public Defender for the Third Judicial District since 1989 and represented the petitioner at trial and on appeal. The petitioner gave a statement to police. However, in counsel's opinion, the petitioner did not admit in the statement to abusing the victim. Counsel argued against the statement's admissibility at trial because it was not incriminating, but the trial court ruled the statement was admissible.

Counsel testified that genetic DNA testing for OI was conducted on the victim, the petitioner, and Jason Brunelle by Tulane University. The purpose of the testing was to determine if one of the victim's parents was a carrier of the disease and had passed OI to the victim. Counsel received the test results during discovery. Counsel acknowledged that the results indicated Jason Brunelle was a carrier for the gene that causes OI. While the results gave the petitioner a possible defense of OI, they did not prove the victim had OI. Counsel said he learned that additional testing had been done by Washington State University,[1] that the test results were in the victim's DCS file, and that counsel believed the results

_____

[1]The testing actually was conducted by the University of Washington.

"conclusively determined something" regarding the victim's having the disease. However, the victim was in the process of being adopted by another family, and Judge Frierson, who was presiding over the victim's adoption, had ordered that her DCS file be sealed, making the file inaccessible to counsel. Judge Beckner, who was presiding over the victim's criminal case, agreed to review the file for exculpatory information before trial. However, he later decided to honor Judge Frierson's order and did not review the file. Counsel said that the attorney general who was prosecuting the petitioner "represented" to counsel that the Washington test results were not exculpatory. Counsel said that he also talked about the Tulane and Washington test results with the petitioner's attorney from the juvenile court proceeding and that the attorney told counsel "there would be nothing that would help my client in those tests."

Counsel testified that he consulted with a forensic pathologist, Dr. William McCormick, about the victim's possibly having OI. Dr. McCormick did not examine the victim but reviewed the discovery materials, including the victim's x-rays. Dr. McCormick did not believe the victim had OI, and counsel trusted his opinion. Counsel saw no indication he would get a different conclusion from another expert, and, therefore, did not hire an independent geneticist. Counsel said that after he talked with Dr. McCormick, the defense was left "high and dry" and was unable to use OI to help the petitioner. Counsel did not raise on appeal his inability to have the information from the victim's DCS file because nothing indicated OI was responsible for the victim's fractures and because Dr. McCormick did not believe the victim had OI. Counsel said he had wanted to see the victim or have someone represent that the victim was no longer suffering from broken bones but "never got that." After the petitioner's trial, someone claiming to be the victim's custodial parent told counsel that the victim was "okay." Counsel said that if the victim been diagnosed with OI, the petitioner probably would not have gone to trial. He said he may have met with the petitioner one hundred times and that she was "very emotional and had a bit of a temper."

On cross-examination, counsel testified that he had been representing criminal defendants since 1977 and had handled homicide and child abuse cases previously. Although the offenses occurred in January 2003, the petitioner was not charged with the crimes until May 2005. The petitioner's defenses included showing that the petitioner was not with the victim when the injuries occurred and that someone other than the petitioner injured the victim. Counsel acknowledged that the petitioner admitted pushing on the victim's legs "hard." The petitioner also claimed she dropped the victim but caught the baby by the left arm. However, in addition to the victim's left arm being broken, her right femur and left tibia also had been broken. Counsel acknowledged that the victim's doctors in Johnson City said OI was unlikely in this case. Moreover, counsel said Dr. McCormick told him that the victim's fractures had been caused by severe activity and trauma and that the victim had been "shredded." Counsel cross-examined Jason Brunelle about his temper and about his abusing

the petitioner. Counsel said that he did not remember a fifteen-year plea offer by the State and that the petitioner never gave him the authority to enter into a plea agreement.

On redirect examination, counsel testified that Dr. William P. Allen, a consultant for the Johnson City Medical Center, reported that although the victim's physical findings did not suggest OI, physical findings for type I and type IV OI may not have been obvious in a three-month-old infant. Therefore, Dr. Allen did not rule out that the victim had OI. Dr. Ricky Mohon, who examined the victim after she was transported to the Johnson City Medical Center from the Takoma Adventist Hospital, also concluded that OI was unlikely. Nevertheless, he ordered that a skin biopsy from the victim be sent to the University of Washington for OI testing. Counsel said he was "led to believe that [the biopsy] showed no finding" for OI.

The petitioner testified that the victim and Jason Brunelle tested positive for the gene mutation that caused OI. The petitioner received Jason Brunelle's test result in time for trial but did not receive the victim's test result until the petitioner was in prison. The petitioner said counsel was "very cooperative" and "did do the best that he could." She said that "D.C.S. wouldn't tell me nothing, wouldn't tell him nothing, wouldn't release records." She said she did not learn about the University of Washington's testing on the victim until her trial and that counsel should have done more to get the victim's DCS file. She said she asked counsel for further testing on the victim in order to get a definitive answer on whether the victim had the disease. The petitioner said that she had never been charged with a crime before and that she did not hurt the victim. She stated that counsel told her about an offer from the State to plead guilty in exchange for a fifteen-year sentence but that she turned down the offer because she was not guilty.

On cross-examination, the petitioner acknowledged that counsel listened to her and talked with her about the State's witnesses. She said that Jason Brunelle had a "mighty temper" but that she did not remember accusing him at trial of abusing the victim. She said that she was "really upset" when she gave her statement to the investigator and that "that was not the correct time to question anybody." She said she and counsel disagreed about several things, but she acknowledged that counsel filed motions and "fought for [her]." When asked on redirect examination why she had apologized in her statement for causing the victim's pain, she explained, "I didn't want to see my child hurt by no means, sir. I would never want to see my child hurt." She said the explanation for the victim's fractures "pointed . . . to the illness and no one wants to listen."

Jane Grooms, the petitioner's maternal grandmother, testified that she lived about one block away from the petitioner, the victim, and Jason Brunelle at the time of the crimes and that she saw the victim every day. The victim would have crying spells and then would have

quiet time. Grooms saw the petitioner give the victim medicine for colic. After receiving the medicine, the victim would fall asleep. Grooms worked with low income families when she was employed by the University of Tennessee Extension Service. She said that she had reported child abuse previously and that "I know child abuse when I see it." She said everyone was trying to figure out why the victim was crying and that she never saw anyone hurt the victim. Grooms talked with counsel about the genetic test results from Tulane, but she did not know about any other test results.

On cross-examination, Grooms testified that the victim's crying was abnormal. However, she said she did not remember testifying at trial that she did not hear or see anything abnormal from the victim. She said she "wasn't thinking too well all that day."

At the conclusion of the hearing, the post-conviction court asked the State if it had the Washington test results. The State said that it would go through its file to see if the results were present. The court told the State to make the results part of the record as exhibit 10. A letter from Dr. Peter H. Byers from the University of Washington's School of Medicine was later made a part of the record. The letter is in the record before us and labeled as exhibit 10. According to the letter, the University of Washington received the victim's skin biopsy in 2003 and examined polymorphic markers in the COL1A1 gene from the victim's DNA. The letter also stated,

> Typically in individuals with OI type I the amount of type I procollagen is reduced by half. The cells from your patient synthesized less than normal but greater than half of the usual amount of type I procollagen. We are uncertain if this finding is significant in terms of disease causation or is simply biological variation among samples.

Dr. Byers also stated in the letter that he was "unable to exclude the diagnosis of OI type I and that "[i]t would be helpful to review the DNA-based testing completed by the [Tulane] lab[.]"

Regarding the petitioner's claim that counsel was ineffective because she was not provided with all of the victim's genetic test results, the post-conviction court noted that counsel obtained the victim's x-rays, medical reports, and DNA results from Tulane and that counsel met with Dr. McCormick. Dr. McCormick reviewed the evidence and determined that nothing, including the DNA results, was exculpatory. The court concluded that counsel "correctly did what he could" with the information and that the petitioner did not receive the ineffective assistance of counsel.

Regarding the petitioner's claim of newly discovered evidence, the post-conviction court referred to the Tulane University test results, which reported that the victim and Jason Brunelle both had a "nucleotide C to T substitution at position – 167 from the start of translation" and that "[t]he biological significance of this substitution is currently unknown and clinical correlation is required." The court also referred to a report in the post-conviction record prepared by Dr. William P. Allen, a physician at ETSU Physicians and Associates. According to the report, Dr. Allen examined the victim on January 30, 2002, when she was eleven months old. Dr. Allen noted the nucleotide substitution reported by Tulane and wrote that

> there are multiple "sequence variations" that we all carry in our DNA that are not of clinical significance. It is considered that the sequence variation identified in [the victim] and her biological father is likely a "benign polymorphism," as [the victim] has demonstrated no further fractures since discharge from the hospital.

Based upon the reports from Tulane University and the University of Washington, the post-conviction court concluded that newly discovered evidence did not exist and denied the petitioner's motion for additional genetic testing.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

The petitioner contends that she received the ineffective assistance of counsel because counsel "could have done more" to investigate the OI defense; failed to hire an independent

geneticist; should have pursued whether he was entitled to review the victim's DCS file, especially any evidence in the file regarding OI; and failed to raise on appeal his inability to review the file. She argues that counsel's performance was deficient because he "failed to obtain information essential to establish an alternative cause" for the victim's injuries and that she was prejudiced by the deficiency because she "was deprived of the opportunity to further investigate or perhaps even prove at trial" that the victim suffered from OI. The State argues that the petitioner has failed to show that she received the ineffective assistance of counsel because she has not shown what more counsel should have done to investigate an OI defense and because it was reasonable for counsel to have decided not to hire an independent geneticist in light of what counsel knew before trial. We agree that the petitioner is not entitled to relief on this issue.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Counsel testified that he had the Tulane University test results before trial and that the results did not prove the victim had OI. Although the results showed the victim and her

father shared the same genetic translocation, Jason Brunelle testified that he had never had a broken bone. Counsel cross-examined Brunelle about his having OI, and Brunelle testified that although he originally thought someone in his family had OI, he later learned that was not true. Counsel testified that he was aware of genetic testing conducted by the University of Washington, that the results would not be disclosed to the defense, and that the State "represented" the results did not contain exculpatory information. Dr. McCormick reviewed the victim's case, including the Tulane University test results, and concluded that the victim did not suffer from OI and that significant force and trauma caused her fractures. Counsel testified that he trusted Dr. McCormick's opinion and that he did not see any reason to hire an independent geneticist. The post-conviction court obviously accredited counsel's testimony, and the petitioner did not present testimony from a geneticist to contradict Dr. McCormick's conclusions. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of [her] defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on the benefit such a witness might have offered to the petitioner's case, nor may we guess as to any evidence further investigation may have uncovered. Id.

The petitioner has failed to suggest what more counsel could have done at trial to have furthered an OI defense or to have gained access to the DCS file. We note that "[u]nder Pennsylvania v. Ritchie, a DCS file may be submitted to a trial court for in camera review, and if a defendant is aware of specific information in the file, he may request it from the court and argue its materiality." Charles Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 Tenn. Crim. App. LEXIS 921, at *23 (Knoxville, Nov. 6, 2009) (citing Ritchie, 480 U.S. 39, 60 (1987)). In any event, counsel testified that the prosecutor and the petitioner's attorney from the juvenile proceeding told him the test results in the file were not exculpatory, and counsel apparently knew of no other information in the file that was material to the petitioner's case. The petitioner did not request that the post-conviction court review the file, and she has failed to show that the DCS file contained any exculpatory information, that counsel's failure to obtain the file fell below the expected standard, or that counsel's failure to obtain the file prejudiced her case. See id. Therefore, she has failed to show that she received the ineffective assistance of counsel for counsel's failure to raise the issue on direct appeal. Furthermore, given the evidence at trial, particularly Dr. Thomas' testimony; the fact that neither the Tulane nor the Washington test results proved the victim had OI; and the fact that the petitioner's own potential expert would have testified that the victim did not suffer from OI and was "shredded," we again conclude that the petitioner has failed to demonstrate any prejudice.

## B. Further Genetic Testing

Next, the petitioner argues that the post-conviction court erred by denying her motion for additional genetic testing on the victim because additional testing is necessary to show the victim has OI and is authorized by the DNA Analysis Act of 2001. The State argues that the Act does not authorize the type of testing requested by the petitioner. We agree with the State.

The Post-Conviction DNA Analysis Act of 2001 provides that

> a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303. A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

-11-

Tenn. Code Ann. § 40-30-304. As noted by the State,

> The Act's reach is limited to the performance of DNA analysis
> which compares the petitioner's DNA to samples taken from
> biological specimens gathered at the time of the offense. The
> statute does not authorize the trial court to order the victim to
> submit new DNA samples years after the offense, nor does the
> statute open the door to any other comparisons the petitioner
> may envision.

Sedley Alley v. State, No. W2006-01179-CCA-R3-PD, 2006 Tenn. Crim. App. LEXIS 470, at *27 (Jackson, June 22, 2006).

The petitioner is requesting additional genetic testing on the victim in order to prove conclusively that the victim has OI. However, Alley clarifies that the Act does not authorize such testing. Therefore, the trial court did not err by denying the petitioner's request for additional testing in this case.

## C. Newly Discovered Evidence

Finally, the petitioner contends that the post-conviction court incorrectly determined that the University of Washington test result does not constitute newly discovered evidence. The petitioner concedes that an issue of newly discovered evidence should be raised in a petition for writ of error coram nobis, not in a petition for post-conviction relief. Nevertheless, the petitioner requests that we address this issue "to the extent that the issue was raised and the post-conviction court ruled upon the same." Although the State's appellate brief mentions the petitioner's argument in a footnote, the State has not addressed whether the test result constitutes newly discovered evidence or whether the issue is properly before us. We conclude that the post-conviction court should not have ruled on the issue of newly discovered evidence and that we will not address the issue.

Tennessee Code Annotated section 40-26-105(a) and (b) provides as follows:

> There is made available to convicted defendants in criminal
> cases a proceeding in the nature of a writ of error coram nobis,
> to be governed by the same rules and procedure applicable to the
> writ of error coram nobis in civil cases, except insofar as
> inconsistent herewith. . . . Upon a showing by the defendant
> that the defendant was without fault in failing to present certain
> evidence at the proper time, a writ of error coram nobis will lie

-12-

for subsequently or newly discovered evidence relating to
matters which were litigated at the trial if the judge determines
that such evidence may have resulted in a different judgment,
had it been presented at the trial.

Therefore, a request for a new trial based on newly discovered evidence should be raised in
a petition for writ of error coram nobis. Moreover, this court may not treat a petition for
post-conviction relief as one requesting relief under the writ of error coram nobis. Asata
Lowe v. State, No. E2006-02028-CCA-MR3-PC, 2008 Tenn. Crim. App. LEXIS 176, at
**65-66 (Knoxville, Mar. 10, 2008), perm. to appeal denied, (Tenn. 2008); see also Harris
v. State, 102 S.W.3d 587, 591-594 (Tenn. 2003).

Initially, we note that we are deeply perplexed that the trial court in this case refused
to conduct an in-camera review of the sealed DCS file.[2] Our review of the trial transcript
confirms that the trial court originally had planned to conduct an in-camera review of the file
in order to ensure that the file did not contain evidence exculpatory to the petitioner.
However, the trial court later informed defense counsel that it would not conduct the review
because "a very respected chancellor . . . has found that it would be a violation of the law in
his opinion for us to open those files [for] any purpose at this time." The trial court did not
cite to any statutory authority that would have prevented such a review, and we know of
none. The trial court should have reviewed the file, including the test result in question.

In any event, the record shows that the petitioner did not have the University of
Washington test result when she filed her pro se petition for post-conviction relief or at the
evidentiary hearing on the petition. Without the test result, we are puzzled as to how the
petitioner could claim that it constituted newly discovered evidence. Similarly, we are
puzzled as to how the post-conviction court could rule on the issue when the petitioner did
not have the test result needed to make an argument for newly discovered evidence.
Regardless, the issue should have been raised, and ruled upon, in a petition for writ of error
coram nobis. Therefore, the post-conviction court's determination that newly discovered
evidence does not exist in this case is reversed.[3]

---

[2]The judge who presided over the post-conviction hearing was not the judge at trial.

[3]The petitioner can raise the issue in a petition for writ of error coram nobis with the benefit of
having the test result needed to make an informed argument. We recognize that a petition for writ of error
coram nobis relief must be filed within one year of the time the judgment becomes final in the trial court.
Tenn. Code Ann. § 27-7-103; State v. Mixon, 983 S.W.2d 661, 671 (Tenn. 1999). However, our supreme
court has held that due process requires balancing the "governmental and private interests involved" and that
the statute of limitations must be tolled if the private interest outweighs the government's interest in

(continued...)

### III.  Conclusion

Based upon the record and the parties' briefs, the judgment of the post-conviction court is affirmed in part and reversed in part.

_____
NORMA McGEE OGLE, JUDGE

---

[3](...continued)
preventing stale and groundless claims   Burford v. State, 845 S.W.2d 204, 209 (Tenn. 1992).